UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

STEVEN A. PICO, by his next friend        DOCKET NO. 77 C 217
FRANCES PICO et al.,

                    Plaintiffs,

        - against -
                                          MEMORANDUM AND ORDER
BOARD OF EDUCATION, ISLAND TREES
UNION FREE SCHOOL DISTRICT et al.,

                    Defendants.

- - - - - - - - - - - - - - - - - - x

PRATT, J:

            On January 4, 1977, plaintiffs filed this action

for injunctive and declaratory relief in New York State

Supreme Court alleging violation of their rights under the

federal and state constitutions and 42 USC §1983.  Basically,

the suit challenges defendant board of education's removal

of certain books from the school libraries and curriculum of

the Island Trees Union Free School District.

            On January 29, 1977, defendants filed their

petition for removal to this court.  Plaintiffs' motion to

remand was denied by memorandum and order filed August 16,

1977, because this case, unlike Presidents Council, District

25 v. Community School Board #25, 457 F2d 289 (CA2) cert.

denied, 409 US 998 (1972), presented substantial questions

of federal constitutional law.  Thereafter, plaintiffs moved

for certification of this case as a class action and both

sides moved for summary judgment.  These are the motions now before the court.

## FACTS

Both parties agree to the following facts.[1]  In September, 1975, the president, vice-president and another member of the board of education (board) of the Island Trees Union Free School District attended a conference sponsored by a conservatively oriented parents group called Parents of New York United (PONY-U).  There, they obtained a collection of excerpts from books which PONY-U had classified as "objectionable."

On November 7, 1975, the president and vice-president of the board searched the card catalogue of the Island Trees High School and found cards for nine of the "objectionable" books.[2]  The president of the board then asked the principal of the junior high school to check his school's catalogue, which was found to contain cards for one additional "objectionable" book.[3]  Subsequently, a school official discovered another "objectionable" book[4] in the curriculum of a 12th grade literature course; the board had approved its inclusion in 1972.  On February 24, 1976, at a "private session" of the board, attended as well by the superintendent of schools and the principals of the junior and senior high schools, the board gave an "unofficial

2

direction" that the objectionable books be removed.

On March 3, 1976, the president of the board issued a memorandum to the superintendent, reiterating "the board's desire that all copies of the library books in question be removed from the libraries to the board's office * * * ". These eleven books were immediately removed by the superintendent,[5] pending further board action, and delivered to the board's office, where board members could personally review the books.

On March 19, 1976, the board issued a press release, attached to the complaint as Exhibit A.  It read:

> PRESS RELEASE - March 19/76
>
> The Board of Education finds it necessary to call this press conference because of distortions, misinformation, and the obvious attempt by the New York Daily News in a cartoon published this morning, to characterize two members of the Board as a pair of shady hoods who surreptitiously sneak into school buildings under cover of darkness to snatch library books.
>
> It comes as no surprise to this Board of Education that it is once again the subject of attack by Teacher Union leaders, headed by Walter Compare.  With the election of school board candidates just two months away, the Teachers' Union is once again attempting to discredit the Board and win the seats for two union-backed lackeys.
>
> While at the conference, we learned of books found in schools throughout the country which were anti-American, anti-Christian, anti-Semetic (sic), and just plain filthy. Upon their return, Ahrens & Martin in early November

3

went to the Senior High School to check the card catalog to see if any of these objectionable books were in our library. We discovered nine such books. We neither removed books, nor cards from the card file.

At the next meeting of the Board, the entire Board discussed how to handle this situation, realizing that to make the titles of the books public might cause a sudden run on the library by the students.

The Board decided that the Principals of the Senior and Junior High Schools would be called in and be directed to gather up the books in question and bring them to the entire Board, for review. This order was carried out earlier this month. The Board is presently reviewing the contents of the books.

To date, what we have found is that the books do, in fact, contain material which is offensive to Christians, Jews, Blacks, and Americans in general. In addition, these books contain obscenities, blasphemies, brutality, and perversion beyond description.

This Board of Education wants to make it clear that we in no way are BOOK BANNERS or BOOK BURNERS. While most of us agree that these books have a place on the shelves of the public library, we all agree that these books simply DO NOT belong in school libraries, where they are so easily accessible to children whose minds are still in the formulative stage, and where their presence actually entices children to read and savor them. As U.S. Commissioner of Education, T. H. Bell, has said, "Parents have a right to expect that the schools, in their teaching approaches and their selection of instructional materials, will support the values and standards that their children are taught at home. And if the schools cannot support those values, they must at least avoid deliberate destruction of them."

We who are elected by the community, are the eyes and ears of the parents. It is our duty, our moral obligation, to protect the children in our schools from this moral danger as surely as from physical and medical dangers.

4

We have some books which have been reviewed, marked, and underlined. However, if they are read in front of a television camera, the FCC would never permit it to be aired. This stuff is too strong for adult viewers, but some of our educators feel it is appropriate for child consumption.

We are sure that when most of our teachers are given the opportunity to review the material, they will side with the Board, and against the Executive Committee of their own union. When most of the parents review these books, we are confident they will back us to the hilt, grateful that we have done our job and remained as they elected us ...their faithful Watchdogs.

Finally, we have the books here for your inspection. We will gladly make copies of individual pages to (sic) the UNbelievers.

> BOARD OF EDUCATION
> Island Trees Union Free
> School District

March 19, 1976.

On March 30, 1976, the board met and ratified the already accomplished transfer of the "objectionable" books to the office of the board. At the same meeting, the board appointed four Island Trees parents along with four staff members (not including a librarian) to act as a "Book Review Committee" to make recommendations to the board on the educational suitability of the books.

In its first report to the board on April 30, 1976, the committee recommended return of one book[6/] to the libraries and curriculum subject to parental approval. On July 1, 1976, the committee submitted its final report,

5

recommending that four books [7] be "retained" by the school libraries, and that two books [8] be "removed". As to the remaining four books, the members of the committee could not agree about two of them, [9] recommended that parental approval be required for access to another, [10] and took no position on the last [11] because not all the members had been able to read it.

On July 28, 1976, the board acted on the committee report, resolving that one book be returned without restriction, [12] that one book be returned with students' access conditioned on parental approval, [13] and that the remaining nine books, "be removed from elementary and secondary libraries and for use in the curriculum." Explaining the meaning of this last phrase, the president of the board stated in his deposition that these nine books should not be assigned as required, optional, or even suggested reading although the books might still be discussed in class. [14]

Besides agreeing about the occurrence of the above events, the parties substantially agree about the motivation behind the board's actions. In his affidavit, the president of the board explains:

> I am basically a conservative in my general philosophy and feel that the community I represent as a school board member shares that philosophy. It is to this that I attribute my re-election on a number of occasions. I feel that it is my duty to apply my conservative principles

6

to the decision making process in which I am involved as a board member and I have done so with regard to fiscal matters, student discipline, teacher performance, union negotiations, curriculum formation and content and other educational matters. * * *

My objection is to the obscenity and bad taste contained in [the books] as well as their irrelevance, in my opinion, to the basic curriculum of the district and to the values which I, as a board member and president, feel the community wishes inculcated in its youth. The whole thing has been blown out of proportion. The best way to indicate the basic reasons of the board as a whole for the actions taken is to annex various statements made by the board to the public as these events were taking place. * * * A review of these materials * * * will indicate that the excerpts about which we were concerned (and later the books themselves) contain every form of obscenity and sexual allusion imagineable (sic). Granted one * * * also makes ridiculous disparaging remarks about Christ and one * * * about Jews. This does not mean that my objection is based on religious grounds or a desire to favor or exclude one religion over another. I just plain think it is in terrible taste and irrelevant to the educational process in my district -- not to mention being obscene. * * *

We are the elected members of a board charged with the custody of thousands of youngsters during the school day. We stand in the shoes of their parents during that time. These students do not have the same rights to be exposed to obscenities as an adult. I will certainly not be an instrument of it. If they wish to read the "banned" books they are welcome to while not in school as long as their parents do not object. Most of these volumes are in the public library so there are alternative sources. As long as I have the legal right to exercise my discretion in the way I have, I shall

7

continue to do so.  This is the essence of the concept of community standards and local control of school boards.

Despite the board president's opinion quoted above, defendants in their Rule 9(g) statement concede that the books are not obscene;  instead they argue that the "objectionable" books are in bad taste and irrelevant to the curriculum.  Defendants' reply memorandum to the brief of amicus curiae American Jewish Committee puts the point as follows:

> Amicus' memorandum states that * * * the Court should intercede "when a school board, acting on the basis of its political or religious views violates these [first amendment] rights."  We agree fully. Amicus also states that * * * defendants (sic) acts were "Guided by their political views...." and * * * that the decision was made "on the basis of its [the board's] political orientation."  That this is not so is obvious from a reading of defendants' affidavits and the exhibits annexed thereto as well as Messrs. Ahrens' and Martin's depositions.  These documents (most of which are public school records) are replete with proof that religious and political considerations were far from defendants' minds, but that their conservative philosophy of morals and traditional values was the dominant factor.  * * *
>
> Additional reference to the depositions of Frank Martin * * * and Richard Ahrens * * * as well as a reading of the whole of the depositions sustain the conclusion that defendants' basic concern was morality and vulgarity and its relevance to the educational process as well as the obvious bad taste exhibited in the volumes in question - not politics and religion.
> (emphasis supplied)

8

The pleadings and affidavits submitted by all parties and _amici_ demonstrate that the board acted not on religious principles but on its conservative educational philosophy, and on its belief that the nine books removed from the school library and curriculum were irrelevant, vulgar, immoral, and in bad taste, making them educationally unsuitable for the district's junior and senior high school students.  Absent any dispute over a material fact, there is nothing to prevent decision of the cross-motions for summary judgment.

ISSUES

The motions present four issues.  (A) subject matter jurisdiction; (B) class certification; (C) the constitutionality of the board's action in removing or restricting access to the library books; and (D) the constitutionality of the board's action in removing the books from "use in the curriculum."

A.  Jurisdiction.

Plaintiffs allege jurisdiction over both the school board and its members in their official capacities under 42 USC §1983 and 28 USC §1343.  Defendants respond that neither the board nor its members in their official capacities are "persons" subject to suit under 42 USC §1983, because the board is a municipal corporation and its members are municipal

9

officers, all of whom are immune from suit under §1983 under Monroe v. Pape, 365 US 167 (1961) and Monell v. Department of Social Services of the City of New York, 532 F2d 259 (CA2 1976). Since the filing of defendants' brief, Monell has been reversed by the Supreme Court, 98 SCt 2018 (1978). In language directly applicable here, Justice Brennan, for the majority, wrote that:

> Local governing bodies, therefore, can be sued directly under section 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision affirmatively adopted and promulgated by that body's officers.
> Id. at 2036.

Since these books were removed from the Island Trees school library pursuant to a decision affirmatively adopted and promulgated by the board, the court does have subject matter jurisdiction under §1983 over the board and its individual members in their official capacities. Id. at footnote 55.

B.  Class Certification.

Plaintiffs have moved for class action certification under FRCP 23(b)(2). To qualify, plaintiffs must satisfy the following requirements of FRCP 23(a) & (b)(2):

> (a) One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class

10

is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

* * *

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole * * * ."

Plaintiffs fail to qualify in two respects. First, the claims of the named plaintiffs are not typical of the claims which might be asserted by all members of the proposed class, namely, all students in the Island Trees junior and senior high schools. The named plaintiffs and their parents who represent them as "next friends" oppose the restrictions on access to school library books, but there is reason to believe that at least some students, and perhaps even a majority of parents, in the district feel otherwise.

Second, there is no advantage to class action certification in this case. In terms of FRCP 23(b)(2), there have not been events, "making appropriate final injunctive

11

relief or corresponding declaratory relief with respect to the class as a whole."  A disposition either way would be as effective without the procedural complexities that attend class certification.  The motion for class certification is therefore denied.

C.  The Constitutionality of the Board's Action in Removing or Restricting Access to Library Books.

It is necessary to begin by focusing the issue. The complaint alleges five separate causes of action based on the board's removal and restriction of access to library books:  (1) violation of New York State Constitution Art. 1 §8, guaranteeing liberty of speech; (2) violation of the same provision insofar as it guarantees academic freedom to librarians; (3) violation of the first amendment to the United States Constitution, guaranteeing freedom of expression; (4) violation of the same amendment insofar as it guarantees academic freedom to librarians; and (5) violation of 42 USC §1983.

These five causes of action reduce to a single claim for purposes of this decision.  The claims to freedom of speech and academic freedom under the New York State Constitution are governed by the same principles that apply under the first amendment to the federal constitution. East Meadow Community Concerts Association v. Board of Ed. of

Union Free School District No. 3, 18 NY2d 129, on remand 27 AD2d 819, 273 NYS2d 736, affirmed 19 NY2d 605 (1967). Moreover, an independent, direct cause of action under the first amendment is superfluous, since the same allegations support a cause of action for violation of first amendment rights under 42 USC §1983. Turpin v. Maillet, 579 F2d 152 (CA2 1978).

Finally, plaintiffs have no standing to assert the rights of librarians to academic freedom under either the New York State or federal constitutions.

> [O]ne to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.
> United States v. Raines, 362 US 17, 22 (1960).

And there is no reason to relax this bar against third-party claims here, where there is no showing that the librarians of Island Trees could not have joined this action as plaintiffs or intervenors, had they wanted to do so, and where none of the classic exceptions to the bar against third-party claims applies. Tribe, American Constitutional Law, §3-26.

Thus, for purposes of this decision, the five causes of action in the pleadings reduce to a single cause of action under 42 USC §1983, alleging that the school board's removal of the library books violates the first amendment

13

rights of the student plaintiffs.

To support this first amendment claim, plaintiffs lean heavily on the three most recent federal court decisions involving school board bans on library books: Minarcini v. Strongsville City School Dist., 541 F2d 577 (CA 6 1976), Right to Read Defense Committee of Chelsea v. School Committee of the City of Chelsea, 454 F Supp 703 (D Mass 1978), and Salvail v. Nashua Board of Education, No. 78-401 (DCNH dated May 7, 1979). Each of these cases struck down school board restrictions on or removal of library books as unconstitutional, and distinguished Presidents Council, supra, 457 F2d 289 (CA2) cert. denied, 409 US 998 (1972), the only federal case to uphold similar school board restrictions on library books and the only case on point in this circuit. For reasons set forth below, this court concludes that Presidents Council, and not the three more recent federal cases, governs the case at bar and mandates summary judgment in favor of defendants on the issue of restrictions on library books.

In Presidents Council, the Second Circuit had to pass on the constitutionality of a New York City local school board's restriction on access to a single book in a junior high school. Upholding the school board, the court, through Judge Mulligan, began by noting the extensive review pro- cedures, both administrative and judicial, available under New York law to challenge the determination of a local

14

school board, procedures which would make it not "appropriate for this court to review either the wisdom or the efficacy of the determinations of the Board."  Id. at 291.  The court then looked for the test to be applied by a federal court in reviewing the constitutionality of school board restrictions. That test was found in Epperson v. Arkansas, 393 US 97 (1968):

> By and large, public education in our Nation is committed to  the control of state and local authorities.  Courts do not and cannot, intervene in the resolution of conflicts which arise in the daily operations of school systems and which do not directly and sharply implicate basic constitutional values.
> Id. at 104.

Applying this standard the court found "no impinge-ment upon any basic constitutional values."  Id. at 291. Placing the controversy in context, Judge Mulligan noted:

> Since we are dealing not with the collection of a public book store but with the library of a public junior high school, evidently some authorized person or body has to make a determination as to what the library collection will be.  It is predictable that no matter what choice of books may be made by whatever segment of academe, some other person or group may well dissent.  The ensuing shouts of book burning, witch hunting and violation of academic freedom hardly elevate this intramural strife to first amendment constitutional proportions.  If it did, there would be a constant intrusion of the judiciary into the internal affairs of the school.  Academic freedom is scarcely fostered by the intrusion of three or even nine federal jurists making curriculum or library choices for the community of scholars.  When the court has intervened, the circumstances have

15

been rare and extreme and the issues
presented   totally distinct from those we
have here.

Id. at 291-92.

Turning specifically to the facts at hand, the

Second Circuit panel concluded:

> Here, patently we have no religious
> establishment or free exercise question,
> and neither do we have the banning of the
> teaching of any theory or doctrine.  The
> problems of the youth in the ghetto,
> crime, drugs and violence have not been
> placed off limits by the Board.  A book
> has been removed but the librarian has
> not been penalized, and the teacher is
> still free to discuss the Barrio and its
> problems in the classroom.  The action of
> the Board does not even preclude the
> teacher from discussing [the restricted
> book] in class or from assigning it for
> outside reading.  In those libraries
> which have the book, the parent can
> borrow it and, if he sees fit, can loan
> it to his child if he wishes to read it.
> [footnote omitted].  The intrusion of the
> Board here upon any first amendment
> constitutional right of any category of
> plaintiffs is not only not "sharp" or
> "direct", it is miniscule.
>
> Id. at 292.

The panel found "unsupportable under any theory of

constitutional law we can discover" the concept of "a book

acquiring tenure".  Appellants had argued that although the

board had ultimate authority in the initial selection of

books for the school library, a different case was presented

where the book, once shelved, is now removed.  Rejecting the

analogy to tenure in public employment, the court found it

clear that "books which become obsolete or irrelevant or

16

were improperly selected initially, <u>for whatever reason</u>, can be removed by the same authority which was empowered to make the selection in the first place." <u>Id</u>. at 293 (emphasis supplied).

Despite this apparently clear rejection of the concept of book tenure by the Second Circuit, plaintiffs here reassert the concept, relying on one subsequent Sixth Circuit case, <u>Minarcini v. Strongsville City School District</u>, <u>supra</u>, and two federal district court decisions, <u>Right to Read Committee of Chelsea v. School Committee of the City of Chelsea</u>, <u>supra</u>, and <u>Salvail v. Nashua Board of Education</u>, <u>supra</u>. Although each of these cases purports to "distinguish" <u>Presidents Council</u>, upon analysis it is clear that in both language and result they simply adopt the book tenure concept that was rejected by the Second Circuit, and hold that once a school library book has been selected and acquired, the first amendment prevents the school board from later removing it because of its content.

In <u>Minarcini</u>, the Sixth Circuit concluded that

> the School Board removed the books because
> it found them objectionable in content
> and because it felt that it had the
> power, unfettered by the First Amendment,
> to censor the school library for subject
> matter which the Board members found
> distasteful.
> 541 F2d at 582.

17

It then noted that

> Neither the State of Ohio nor the Strongsville School Board was under any federal constitutional compulsion to provide a library for the Strongsville High School or to choose any particular books.  Once having created such a privilege for the benefit of its students, however, neither body could place conditions on the use of the library which were related solely to the social or political tastes of school board members.
> <u>Id.</u> at 582.

In reaching its conclusion that a content-based removal of a school library book infringed the students' first amendment rights, the court argued that a public school library is a valuable adjunct to classroom discussion, that removal of library books is a serious burden on such discussion and that the burden is not minimized because a book is available in sources outside the school.  Referring to libraries generally, the court reminded us that "a library is a mighty resource in the free marketplace of ideas", "specially dedicated to broad dissemination of ideas", and asserted that it is "a forum for silent speech".  <u>Id.</u> at 582-83.  Recognizing that it is the book's speech, not the student's, that was limited by removing a book from the library, the court drew on the "right to receive" doctrine expounded in <u>Virginia State Board of Planning v. Virginia Citizens Consumers Council, Inc.</u>, 425 US 748, and other Supreme Court cases, and concluded that the students right to receive information, their "right to know", was unconstitutionally infringed when

the board removed books because of their content.

With similar reasoning the district courts in _Right to Read_, _supra_ and _Salvail_, _supra_ also found to be unconstitutional content-based removal of reading material from school libraries. With all due deference to those courts and the Sixth Circuit, they do not accurately interpret the Second Circuit's holding in _Presidents Council_. It is true that a variety of considerations may affect the decision of what books to maintain in a school library at a given time. Availability of funds, shelf space and personnel are all significant, but the principal reason for selecting and keeping books is their content. Indeed, in deciding what books to place in a school library a school board not only may, but must choose on the basis of content; to do less would be to neglect their statutory duty. Yet, _Minarcini_, _Right to Read_ and _Salvail_ each would require a school board to be content-blind and act only for reasons such as space, physical obsolescence or other considerations that are "neutral" under the first amendment.

At the heart of the controversy is the constitutional role of the school board in public education. In New York, control of the public schools is committed to locally elected bodies, a commitment that "requires significant public control over what is said and done in school."

19

East Hartford Education Assn. v. Board of Education, 562 F2d 838, 856 (CA2, en banc, 1977). One of the principal functions of public education is indoctrinative, to transmit the basic values of the community. James v. Board of Education, 461 F2d 566, 573 (CA2 1972), cert. den. 409 US 1042. A constitutionally required "book tenure" principle would infringe upon an elected school board's discretion in determining what community values were to be transmitted.

Here, the Island Trees School Board removed certain books because it viewed them as vulgar and in bad taste, a removal that clearly was content-based. Whether they were correct in their evaluation of the books is not the issue. Nor is the issue whether, assuming the books to be vulgar and in bad taste, it is a wise or even desirable educational decision to sanitize the library by removing them, thereby sheltering the students from their influence. Such issues should be decided and remedied either by the school district's voters, or by the State Commissioner of Education on an appropriate administrative appeal.

Here, the issue is whether the first amendment requires a federal court to forbid a school board from removing library books which its members find to be inconsistent with the basic values of the community that elected them. Presidents Council resolved that issue by holding that a book that was improperly selected "for whatever reason"

20

could be removed "by the same authority which was empowered to make the selection in the first place." Presidents Council is controlling here.

Even if this court were not bound by the Second Circuit's holding, it would reach the same result. Although Minarcini, Right to Read and Salvail seek to distinguish book removal from book acquisition, the attempted distinction is not grounded in any sound constitutional principle, and inevitably would break down in actual practice. Maintenance of a school library is an ongoing process. Periodically, books are added and removed, as school officials balance considerations of cost, space, educational need, student demand and faculty interest. As already noted, within the constraints of money and space, content is the primary criterion for selection.

If, as in Minarcini, Right to Read and Salvail, a federal court must guard a book against removal because of its content, then how could that same court avoid passing upon a school board's content-based refusal of a student's request to acquire a particular book when the funds were available? Disregarding the volume of potential litigation, a court simply is not competent to decide what books are to be in a school's library. The proper agency is the school board, and it would be illogical and unrealistic to deprive a board of its most relevant criterion, content, for making

21

that decision.

Significantly, the school board's action here involved no religious question, either free exercise or establishment; nor was there a ban on the teaching of any theory or doctrine; nor has there been a restriction imposed on classroom discussion, or a penalty inflicted on any teacher or librarian.   Moreover, these restrictions have denied no student the right to silent or open speech as did the restrictions in Tinker v. Des Moines Independent Community School District, 393 US 503 (1969); they have not directly inhibited discussion in the classroom or elsewhere in the schools; and they have focused upon no particular student or group.

The board has restricted access only to certain books which the board believed to be, in essence, vulgar. While removal of such books from a school library may, indeed in this court's view does, reflect a misguided educational philosophy, it does not constitute a sharp and direct infringement of any first amendment right.

D.  The Constitutionality of the Board's Action in Removing the Books from "Use in the Curriculum".

Plaintiffs in this action are students.  No teacher has joined in, nor do plaintiffs establish that any teacher currently desires to use any of the restricted books in the curriculum.  While a student may, under the "right to receive"

15/

22

doctrine, <u>Virginia State Board of Planning v. Virginia Citizens Consumers Council, Inc.</u>, <u>supra</u>, have standing to present a first amendment academic freedom claim, before such a claim may be sustained there must at least be a real, not an imagined controversy. Here, plaintiffs' contention that the board's action interferes with what teachers in the district want to teach, is diffuse, speculative and factually unsupported.

In the absence of a sharp, focused issue of academic freedom, the court concludes that respect for the traditional values of the community and deference to the school board's substantial control over educational content, see <u>East Hartford Education Assn. v. Board of Education</u>, <u>supra</u>, 562 F2d at 859, preclude any finding of a first amendment violation arising out of removal of any of the books from use in the curriculum. As the Second Circuit, <u>en banc</u>, noted in <u>East Hartford</u>, at 859:

> The very notion of public education implies substantial public control. Educational decisions must be made by someone; there is no reason to create a constitutional preference for the views of individual teachers over those of their employers.

Even less should such a constitutional preference be created for the views of students.

## CONCLUSION

The challenged action by the school board did not sharply and directly implicate basic first amendment values. It fell, therefore, within the broad range of discretion constitutionally afforded to educational officials who are elected by the community.

Accordingly, defendants' motion for summary judgment is granted and plaintiffs' cross-motion for summary judgment is denied. The motion for class certification is also denied. The clerk shall enter judgment dismissing the complaint, without costs.

SO ORDERED.

Dated:  Westbury, New York
        August 2, 1979.

                                                 GEORGE C. PRATT
                                              U. S. DISTRICT JUDGE

## F O O T N O T E S

1/ Both parties submitted Rule 9(g) statements in support of their motions for summary judgment. The court accepts as undisputed all facts alleged in each 9(g) statement except where the 9(g) statements conflict.

2/ (1) Slaughter House Five, by Kurt Vonnegut, Jr.;
   (2) The Naked Ape, by Desmond Morris;
   (3) Down These Mean Streets, by Piri Thomas;
   (4) Best Short Stories by Negro Writers, edited by Langston Hughes;
   (5) Go Ask Alice, Anonymous;
   (6) Laughing Boy, by Oliver LaFarge;
   (7) Black Boy, by Richard Wright;
   (8) A Hero Aint Nothing But A Sandwich, by Alice Childress;
   (9) Soul On Ice, by Eldridge Cleaver.

3/ (10) A Reader for Writers, edited by Jerome Archer.

4/ (11) The Fixer, by Bernard Malamud.

5/ There is some uncertainty about the exact date of removal. The books may have been removed as early as February 25, 1976. It is clear, however, that they were not delivered to the board's office until after March 3, 1976.

6/ The Fixer. This book, though previously in the curriculum, was not found in the libraries.

7/ Laughing Boy, Black Boy, Go Ask Alice, and Best Short Stories by Negro Writers.

8/ The Naked Ape, Down These Mean Streets.

9/ Soul On Ice and A Hero Aint Nothing But A Sandwich.

10/ Slaughter House Five.

11/ A Reader for Writers.

12/ Laughing Boy.

13/ Black Boy.

14/ Whether the curriculum restrictions applied to Black Boy, which was put on restricted access, is unclear from the record.

15/ One book, The Fixer, was a part of the curriculum in one class, until the book was removed by the board in the spring of 1976. There is no assertion by any party that any teacher now wishes to assign this book for use inside or outside the classroom.

25